MARWAIS STEEL COMPANY, Plaintiff,

v.

DEPARTMENT OF the AIR FORCE,
et al., Defendants.

Civ. No. 94–1610.

United States District Court,
District of Columbia.

Sept. 30, 1994.

Robert N. Hickey, Richard D. Lieberman, John Randolph MacPherson, Sullivan & Worcester, Washington, DC, for plaintiff.

Keith V. Morgan, Asst. U.S. Atty., Washington, DC, for defendants.

### MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

In this government procurement case, a disappointed bidder brings suit against the Air Force and the Department of Labor, and the successful bidder intervened as a defendant. The plaintiff challenges the agencies' actions surrounding the award of the contract, and requests injunctive and declaratory relief barring the Air Force from continuing contract performance with the successful bidder.

Before the Court are the plaintiff's motion for preliminary injunction, the defendants' motions for dismissal or summary judgment on all five counts, and the plaintiff's motion for summary judgment on four of the five counts. For the reasons stated below, the defendants' motions for summary judgment

are granted and all of the plaintiff's motions are denied.

### I. Background

In February 1992, the Air Force published a Request for Proposals ("RFP") for the supply of between 359 and 758 revetment kits.[1] These kits are used to assemble double-layered walls to protect aircraft, vehicles, and other military equipment. Each kit consists of approximately 23 tons of corrugated steel panels and the pin fasteners and tools needed to assemble those panels into a wall. The kit also includes polyethylene film and wire screens to seal seams between panels. The RFP set a price of approximately $10 million for each set of 359 kits. The contract was set aside for a small business offeror, pursuant to Subpart 19.5 of the Federal Acquisition Regulations ("FAR").

Among other offerors, Marwais Steel ("Marwais") and Engineered Air Systems ("EASI") submitted bids. EASI's bid involved the participation of a subcontractor, EPIC Metals Corporation ("EPIC"). In October and November of 1993, the Air Force conducted a pre-award survey of EASI and EPIC's operations. The survey generated 10 documents totalling 55 pages and addressed EASI's and EPIC's ability to perform the contract. Also in October 1993, the Air Force obtained 5 pages of cost data from EASI describing the planned allocation of work on the contract between EASI and EPIC.

On November 10, 1993, the Air Force notified Marwais that EASI was the "apparently successful bidder." On November 18, Marwais filed a size protest claiming that EASI was not qualified as a small business under the Small Business Act ("SBA") regulations. The next day, the Air Force forwarded Marwais' protest to a Regional Office of the Small Business Administration (also "SBA"), but did not include the 55–page result of the pre-award survey or the five pages of cost data.

---

1. The contract guaranteed the purchase of 359 kits and provided for the possible purchase of an additional 359 kits.

On December 7, 1993, in a single document, Marwais supplemented its size protest and filed a Walsh–Healey protest stating that EASI did not meet the statutory and regulatory definitions under the SBA and Walsh–Healey Act of a manufacturer or regular dealer of revetment kits. The gist of these protests was that EASI was not qualified to be awarded the contract.

On December 8, 1993, the SBA Regional Office determined that EASI was a small business. Within hours of receiving the SBA's determination, the Air Force awarded the contract to EASI.

On December 15, 1993, Marwais appealed the SBA Regional Office determination to the Office of Hearings and Appeals ("SBA–OHA"), the administration's appellate body. On February 3, 1994, Marwais asked that the 55 pages of preaward survey Data and the 5 pages of cost data be submitted to either the SBA–OHA or the Regional Office. Before the Air Force responded to the request, the SBA–OHA remanded the size determination to the Regional Office because the initial determination lacked supporting evidence and explanation.

On February 24, 1994, EASI requested that the SBA remand be dismissed as moot since the contract had been awarded. The SBA–OHA denied the request on March 10, stating that when a law clerk spoke with the Contracting Officer at the Air Force, "the Contracting Officer requested that the remand decision stand and that a new Size Determination be made." Plaintiff's Exhibit 4, p. 4.

During the week of March 7, 1994, the Air Force provided the SBA regional office with copies of the pre-award survey and the cost data. On May 20, 1994, the Regional Office issued a new size determination, finding that EASI was not a small business. The basis for the new size determination was that EASI relied too heavily on EPIC, thus creating an "affiliation" requiring that the two companies be considered together for purposes of the size determination.

On May 31 and June 2, 1994, EASI appealed this new size determination to the SBA–OHA.

On July 11, 1994, the Air Force issued a determination to Marwais regarding the December-filed Walsh–Healey protest. The determination found that EASI was a manufacturer for purposes of the statute and regulations. Upon Marwais's appeal of this determination, the Department of Labor affirmed.

Marwais requests a preliminary injunction prohibiting the Air Force from proceeding on the contract with EASI, a declaratory judgment stating that EASI is not a qualified small business nor a responsible prospective contractor for purposes of this procurement; a permanent injunction terminating the Air Force's contract with EASI and awarding it to Marwais, and a declaratory judgment overturning the Walsh–Healey determination.

## II. Standard of Review

■ The Administrative Procedure Act ("APA") governs Marwais's action. Therefore, this Court can only set aside the actions of the Air Force or the Department of Labor if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). To prevail, Marwais must meet the

> heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973).

## III. Count One

■ Marwais claims that the Air Force improperly withheld the preaward survey and cost data from the SBA Regional Office at the time of the first size determination. It is easy to understand Marwais's distress over this omission, since the Regional Office eventually changed its position on EASI's size status when it received the data. However, as explained below, the Air Force was under no statutory or regulatory obligation to forward the data to the Regional Office, and thus Marwais's claim must fail.

*A. Analogy to COC regulations.* Marwais notes that the GAO will review some SBA determinations when the procuring agency fails to forward "vital information" to the SBA. *See American Industrial Contractors, Inc.,* B–236410.2, Dec. 15, 1989, 89–2 CPD ¶ 557; *COSTAR,* B–240980, Dec. 20, 1990, 90–2 CPD ¶ 509; *Joanell Laboratories, Inc.,* B–242415.16, Mar. 5, 1993, 93–1 CPD ¶ 207; *RBE, Inc.,* B–252635, July 16, 1993, 93–2 CPD ¶ 27. However, there are at least two reasons why these cases are inapposite.

First, the cited cases do not involve SBA size determinations. Instead, they deal with SBA awards of Certificates of Competency (COCs), which state that an offeror is "responsible" within the meaning of the Federal Acquisition Regulations. FAR § 19.601 *et seq.* The SBA's authority to conduct size determinations is based on a different set of regulatory provisions. FAR § 19.301 *et seq.*

The COC regulations impose a far heavier forwarding burden on the contracting officer than that imposed by the size determination regulations. In fact, the COC provisions explicitly require that pre-award surveys, along with other enumerated items and "any other pertinent information" be forwarded in COC matters. FAR § 19.602–1(c)(2). By contrast, the regulation governing size determinations states only that the procuring agency must forward the "protest" itself. FAR § 19.302(c)(1). Therefore, Marwais cannot rely upon COC cases to define the responsibilities of the contracting officer in size determinations, since the two inquiries have distinct regulatory requirements.

The SBA's own regulations, which are independent of the FAR, further defeat Marwais's claim. Those regulations list the pieces of information that a procuring agency must forward to the SBA for a size determination, and the list does not include preaward surveys or cost data.[2] In fact, the SBA regulations state that "the size determination shall be based primarily on facts and allega-

tions supplied by the protestor and protested concern," suggesting that information provided by the procuring agency is not crucial. 13 C.F.R. § 121.1606(c). If the bidders do not provide sufficient information, the SBA "may make inquiries including requests to the [bidders] or other persons for additional specific information." *Id.* Presumably, the SBA could use this provision to request preaward surveys or cost data from the procuring agency. In any case, neither the FAR nor the SBA's own regulations impose a duty upon the contracting officer to forward preaward surveys or cost data. Discretion to develop the factual record is seated with the SBA itself, which can conduct its own fact-finding inquiries.

It is true that a COC inquiry is broad and encompasses all issues that would be addressed in a size determination. FAR § 9.104–1(g) (requiring compliance with all applicable statutes, thereby including the Small Business Act). However, simply because the COC regulations require the submission of preaward surveys does not mean that a similar requirement applies to the narrower size inquiry. The language and structure of the regulations discussed above shows that the forwarding requirements imposed on the contracting officer in a COC determination should not be imported into a size determination.

Even if the analogy to the COC provisions were somehow sound, there is a second reason why the cases Marwais cites are inapposite. They do not require the contracting officer to forward information about the bidders. Rather, three of the cases require procuring agencies to provide better information about the agencies' own contract specifications. *See American Industrial Contractors, Inc., supra,* (agency did not make clear that only some of eight bid alternatives would be awarded); *COSTAR, supra,* (agency did not state when bidders' quality assur-

---

**2.** The contracting officer must forward:
 (i) The protest and any accompanying materials;
 (ii) A copy of the self-certification as to size;
 (iii) Identification of the applicable size standard;
 (iv) A copy of the solicitation;
 (v) Identification of the date of bid opening; and
 (vi) The date on which the protest was received.
13 C.F.R. § 121.1603(c)(2). None of these items can be interpreted to include the preaward survey data or cost data.

ance programs required to be operative); *RBE, Inc., supra,* (agency provided contradictory definitions of mandatory performance period). At most, these cases suggest that the agency must take great pains to forward all relevant information about its own role in the procurement—the contract specifications—to the SBA. There is no reason to extend the logic of these cases to require agencies to identify all relevant bidder information and forward it to the SBA, since the SBA's own regulations suggest that the key data should be provided by the bidders or requested by the SBA itself. 13 C.F.R. § 121.1606(c).

In the other case that Marwais cites, *Joanell, supra,* the protestor alleged only that the SBA did not consider all of the information before it, and not that the procuring agency withheld information from the SBA. Since *Joanell* did not scrutinize the procuring agency's role at all, it provides even less support for Marwais's claim against the Air Force than the above three cases.

*B. Contracting Officer's duty to file own protest.* Marwais's other argument that Air Force had a duty to submit the survey and cost data is based upon a decision of the Comptroller General stating that

> if information is brought to the attention of the Contracting Officer ... which reasonably would impeach the self-certification of the bidder, the Contracting Officer must file a direct protest with the SBA in order to assure that the self-certification process is not being abused.

*Keco Industries, Inc.,* 56 Comp.Gen. 878 (1977). This case is not sufficiently on point. In *Keco,* no disappointed bidder had filed a pre-award size protest. Therefore, the contract was awarded without an SBA review of the successful bidder's self-certification. To remedy this situation, the Comptroller General required only that the contracting officer file a protest, and did not require that particular information be forwarded to the SBA.

Here, by contrast, Marwais had filed a preaward protest, and the SBA therefore had an opportunity to use its powers of inquiry and acquire necessary information about EASI. The complete absence of review of self-certification that existed in *Keco* does not

exist here. The SBA may have been less than thorough in soliciting information about EASI, but the Air Force did not violate any duty set forth by the Comptroller General, since it did not need to play the role of protestor of last resort required by the facts in *Keco.*

Marwais cites other cases to support this argument, but in each one there was no valid preaward protest filed by a disappointed bidder. *See Robertson and Penn, Inc.,* 65 Comp.Gen. 874 (1986) (bidder's protest untimely); *Putnam Mills,* 61 Comp.Gen. 667 (1982) (same); *Foam–Flex, Inc.,* 62 Comp. Gen. 300 (1983) (bidder's protest insufficiently specific to be forwarded to SBA); *Fiber–Lam, Inc.,* 69 Comp.Gen. 365 (1990) (bidder did not file preaward protest); *Creativision, Inc.,* 66 Comp.Gen. 585 (1987) (same). Like *Keco,* these cases require only that the contracting officer step in and file a protest if one is not already before the SBA. Marwais cannot succeed in using these cases to suggest that the Air Force acted improperly by simply withholding some information after Marwais filed a timely preaward protest.

*C. Conclusion.* No statute or regulation required the Air Force to forward the survey and cost data to the SBA, and the GAO decisions cited by Marwais do not create such a duty. In fact, discretion to develop the factual record in size determinations is seated with the SBA itself, because the SBA is authorized to make its own inquiries in order to acquire more information. Therefore, the Air Force did not abuse its discretion or act arbitrarily, capriciously, or otherwise not in accordance with the law by withholding the preaward survey and cost data.

## IV. Count Two

█ Marwais also claims that the Air Force improperly awarded the contract to EASI, alleging that it failed to inquire adequately into EASI's fitness in three areas. First, Marwais states that the Air Force violated provisions of the FAR and Department of Labor regulations by failing to conduct a Walsh–Healey eligibility determination before awarding the contract. Second, Marwais suggests that the Air Force failed

to scrutinize EASI's compliance with statutory subcontracting limitations before the award. Finally, Marwais claims that the Air Force failed to consider fully whether EASI was a "responsible" contractor within the meaning of the FAR.

■ *A. Walsh–Healey Determination.* A procuring agency may not rely upon a bidder's self-certification of Walsh–Healey eligibility when any of the following circumstances exist:

(1) The contracting officer has knowledge that raises the question of the validity of the representation.

(2) A preaward protest has been lodged.

. . . .

(4) A preaward investigation or survey of the offeror's operations . . . is otherwise made.

FAR § 22.608–2(b). When questioning a self-certification, the contracting officer must make the eligibility determination before award. 41 C.F.R. § 50–201.101(b)(1), FAR § 22.608–2(f).

The Air Force did not make its own Walsh–Healey determination until July 11, 1994, seven months after it awarded the contract. It is apparent that the Air Force erred in this delay, since at least one of the circumstances of FAR § 22.608–2(b) applies here. The Air Force did conduct a preaward survey, fulfilling condition (4). Also, since it had Marwais's Walsh–Healey protest in its possession before it issued the award, the Air Force probably had knowledge questioning the validity of the self-certification, fulfilling condition (1).[3]

However, Marwais did not suffer prejudice by the Air Force's failure to make a Walsh–Healey determination. In fact, the Air Force eventually found that EASI was eligible under Walsh–Healey, and the DOL affirmed that conclusion on appeal. As the discussion of Count Five will explain, the DOL determination was neither arbitrary, capricious nor an abuse of discretion. Therefore, Marwais

has not made the showing required by *Kentron Hawaii, supra,* that the Air Force committed a prejudicial violation of the applicable law.

■ *B. Subcontracting Limitations.* The Small Business Act requires that contracts designated for small businesses only be awarded to a concern if

in the case of a contract for procurement of supplies (other than procurement from a regular dealer in such supplies), the concern will perform work for at least 50 percent of the cost of manufacturing the supplies (not including the cost of materials).

15 U.S.C. § 644(*o*)(1)(B). This requirement is repeated in FAR § 52.219–14. Marwais argues that the Air Force "made no meaningful analysis" of EASI's compliance with this clause. However, the initial SBA report, which the Air Force received before awarding the contract, stated that

EASI has submitted information substantiating that they are performing at least 50% of the work with their own labor force. EASI . . . is found to be in compliance with the Limitations on Subcontracting Clause.

Plaintiff's Exhibit 2.

The Air Force reasonably relied upon this SBA determination. Marwais argues that the Air Force should not have done so because the SBA applied "the incorrect standard," apparently because the SBA stated that EASI was doing "at least 50% of the work" rather than echoing the words of the statute to affirm that EASI was in compliance. It is not at all clear that the SBA applied the incorrect standard. Immediately preceding the passage quoted above, the opinion sets forth the exact standard, stating that the prime contractor must "perform work for at least 50% of the cost of manufacturing the supplies, not including the cost of materials." Plaintiff's Exhibit 2. The document as a whole suggests that the SBA probably was applying the correct test.[4]

**3.** The parties argue over whether Marwais's Walsh–Healey protest should be characterized as pre-award or post-award, but resolution of that issue is not necessary to the Court's analysis.

**4.** When the SBA–OHA reviewed this opinion of the Regional Office, it stated that "[w]e agree with Marwais that the Regional Office appears to have based its analysis on the data concerning direct labor costs only and that this is erroneous

Therefore, it was neither arbitrary, capricious, nor an abuse of the Air Force's discretion to rely upon the SBA's determination regarding the subcontracting limits.

■ *C. Responsibility Determination.* The FAR states that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." FAR § 9.103(b). FAR § 9.104–1 specifies seven factors which a prospective contractor must satisfy in order to be deemed "responsible." These factors include qualification under all relevant statutes and regulations, including the SBA and Walsh–Healey. FAR § 9.105–1 states that

> Before making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contract currently meets the applicable standards in 9.104.

Marwais claims that the Air Force did not properly conduct the responsibility determination because it released no rationale for its finding of responsibility. Marwais also makes two substantive claims, stating that the Air Force should not have approved EASI's SBA and Walsh–Healey eligibility because the pre-award surveys and cost data show that EASI was not qualified under these standards.

Marwais's first point is without merit. FAR § 9.105–2(a) explicitly states that the contracting officer's signature on the contract constitutes a determination of responsibility. There is no other authority requiring any further rationale.

As for Marwais's substantive claims, the Walsh–Healey issue is discussed above. Again, Marwais cannot prevail on this point because it is unable to show that it was prejudiced by any impropriety on the part of the Air Force.

■ As for the size determination issue, Marwais asserts that the Air Force should not have relied upon the SBA's initial approval of EASI, because the Air Force had information in the preaward survey and cost data showing that EASI's arrangement with EPIC circumvented the small business set-aside rules. However, the Small Business Act requires procuring agencies to "accept as conclusive the Administration's determinations as to which enterprises are [qualified small businesses]." 15 U.S.C. § 637(b)(6). This statutory provision makes clear that the Air Force was under no duty to look beyond the judgment of the SBA. Though the preaward survey and cost information may have cast some doubt upon the SBA's opinion,[5] the discussion of Count One concluded that the Air Force had no legal obligation to forward the information to the SBA. To nonetheless require the Air Force itself to sift through this information and perform the job of the SBA would be far too burdensome. The Court cannot mandate such second-guessing under the Administrative Procedure Act's narrow standard of review. The Air Force acted within its discretion and was not arbitrary or capricious when it awarded the contract in reliance upon the initial SBA determination.

## V. Count Three

■ Marwais also claims that the Air Force improperly proceeded on the contract with EASI after the second SBA determination found that EASI was not size-eligible.

*A. The FAR and SBA Regulations.* The defendants suggest that one section of the FAR cleanly disposes of this argument. In describing the SBA–OHA's actions when issuing a decision on appeal, the regulations state that

> [t]he SBA[–OHA] decision, if received before award, will apply to the pending ac-

as a matter of law." Administrative Record. 17 at 10–11. The Court does not challenge the SBA–OHA's determination. Rather, it simply holds that any error that the Regional Office may have made was not so obvious that the Air Force was unjustified in relying upon the opinion.

5. The defendants argue that the preaward survey did not contradict the SBA size determination

because the surveyors recommended that EASI be awarded the contract. However, it is not clear that the surveyors considered or were required to consider EASI's size eligibility in their inquiry. Therefore, on the size issue, the Court accords no weight to the surveyors' positive recommendation.

quisition. *SBA rulings received after award shall not apply to that acquisition.* FAR § 19.302(i) (emphasis added). From the face of this section, it seems that appellate size determinations are only prospective.

However, Marwais cites an SBA regulation stating that protests timely filed "shall apply to the procurement in question even though a contracting officer may have awarded the contract prior to receipt of the protest." 13 C.F.R. § 121.1603(a)(2). Marwais argues that this section requires that the second SBA determination apply to the contract, and that any apparent contradiction between this regulation and FAR § 19.302(i) should be resolved in favor of its interpretation of the SBA regulation.

▆▆▆ In fact, the two provisions do not contradict each other. The language of the SBA regulation shows that it applies to *protests*. Protests are timely if filed within five days of notification of the apparently successful bidder. 13 C.F.R. § 121.1603(a)(2). The purpose of the provision seems to be to prevent procuring agencies from choosing a successful bidder, then quickly awarding the contract before disappointed bidders can bring an applicable size protest. With the regulation in place, procuring agencies cannot shut out applicable protests by awarding the contract before the five-day period has run.

The FAR provision, on the other hand, applies to *appellate decisions*. FAR § 19.303(i) addresses appeals to the SBA–OHA, and in that context, "SBA rulings" mean appellate decisions. The idea behind this provision seems to be that post-award appellate decisions do not apply retroactively, to avoid frequent delays of contract performance pending the outcome of a protracted appeal.

The two provisions, then, are harmonious because the SBA regulation preserves the prospective application of initial determinations on timely protests, and the FAR provi-

sion limits the prospective application of post-award appellate determinations.

No agency or court has previously offered a conclusive clarification of the relationship between these two regulations, but one court has set forth in dicta the interpretation endorsed here. *See SRS Technologies v. United States,* 843 F.Supp. 740 (D.D.C.1994) (drawing analogy between small business and small disadvantaged business provisions of SBA regulations).

In *SRS Technologies,* the Department of Defense accepted bids on a procurement set aside for Small Disadvantaged Businesses (SDBs). A losing bidder filed a protest challenging the apparently successful offeror's SDB status, and the protest was forwarded to the Regional SBA office. The Regional Office did not issue a determination in a timely fashion, and in accordance with regulations the DOD awarded the contract to the identified offeror. Later, the Regional Office found that the offeror was not a qualified SDB, and this determination was affirmed by the SBA–OHA. The DOD then cancelled the contract with the disqualified bidder.

That bidder then sued. The relevant Defense FAR Supplement (DFAR) section was very similar to the FAR section at issue here: "If the [appellate] decision is received after award, it will apply to future acquisitions." DFAR § 219.302–70(h). In sorting out the appellate and initial determinations in *SRS,* the court held that "altering an existing contract based on a late-arriving 'appeal' decision is not allowed" under the section cited above. Following the lead of *SRS,* and the language of the regulations, the court will adopt the interpretation set forth above.

The second SBA determination here is the result of an appellate decision on the part of the SBA–OHA. Though the determination was eventually made by the Regional Office, it was done so at the direction of the SBA–OHA in remanding the case.[6] Reading the SBA regulation and FAR provision as ex-

---

6. To interpret the action on remand as a response to the initial protest and not as an appellate decision would vitiate the policy underlying FAR § 19.302(i). The OHA could remand every case for determinations in accordance with its rulings, and thus stall the procurement process

for as long as someone is willing to bring appeals. The most sensible and manageable dividing line between a "decision on a protest" and an SBA appellate ruling arises when the first appeal is brought.

plained above, Marwais lost its opportunity to have its size protest applied retroactively when the SBA Regional Office first issued its determination. Though later SBA actions may still be binding on EASI in future procurements, they would not apply to the contract at issue here. Moving forward with procurements comes at the expense of some accuracy, and Marwais may suffer when that accuracy is sacrificed, but the SBA regulations and the FAR endorse this tradeoff.

Marwais tries to argue that the "facts mandate compliance" with the second size determination because the Air Force caused the first size determination to be inaccurate through its failure to forward all information to the SBA. This point is unavailing. Though it may seem equitable for the Air Force to reaward the contract, the regulations examined immediately above do not so require. In addition, the discussion of Count One found that the Air Force met all of its legal obligations to forward information. The APA standard of review does not empower this Court to order the Air Force to take the discretionary step of reawarding the contract.

*B. Air Force's Communications with SBA–OHA.* Marwais also claims that the Air Force itself requested the second size determination. It certainly could be arbitrary and capricious for the Air Force to request a second size determination itself and then ignore the results of that determination.

The facts surrounding the Air Force's "request" are far from clear. The OHA stated in its remand decision that an SBA law clerk phoned Connie Thomas, an Air Force employee,[7] and received confirmation that performance on the contract had been stopped. The decision went on to state that

> The Contracting Officer requested that the remand decision stand and that a new size determination be made.

Plaintiff's Exhibit 4, page 4. Thomas sent written confirmation of that phone call on the same day. Her confirming letter stated that

the GAO protest "has not yet been ruled on," and that "[y]our size determination on [EASI] is still required." Defendants' Exhibit 18. Marwais argues that these written statements, along with the actual comments Thomas made on the phone to the SBA law clerk,[8] constitute a request by a contracting officer for a size determination.

At best, Thomas's comments, as recorded in her confirming letter, show that the Air Force wanted the SBA to continue with the remand decision that stemmed from Marwais's appeal. The OHA's decision stated that Thomas requested that the remand decision *stand,* and Thomas's letter stated that the size determination was *still required.* These phrases indicate that an action already begun should proceed. There is no evidence that Thomas or any of the other individuals involved thought she was initiating a new proceeding amounting to the Air Force's own size protest. Any opinion expressed by Thomas on behalf of the Air Force that the determination should proceed does not amount to a request for a determination, and should certainly not bind the Air Force to follow it.

Since the Air Force did not actually or effectively request a second size determination, and since no regulation requires the retroactive application of post-award appellate size determinations, the Air Force did not act arbitrarily or capriciously or abuse its discretion in not revoking the contract award after the SBA issued its second size determination.

## VI. Count Four

■ Here, Marwais alleges that the Air Force 1) failed to supply the necessary information (survey and cost data) for the SBA Regional Office to make an appropriate determination on this issue; 2) improperly relied on the first SBA determination which found that EASI was within the statutory limits; and 3) failed to conduct a proper inquiry to determine if EASI complied with statutory requirements on subcontracting.

---

7. The parties argue over whether Thomas is the contracting officer for this procurement, but the Court need not resolve that dispute.

8. Ms. Thomas's comments during the telephone conversation are not part of the record.

**1458**

Some elements of this count mirror those in Counts One and Two. As explained in Count One, the Air Force was under no obligation to forward the survey and cost data. As explained in Count Two, the Air Force did not improperly rely upon the SBA's initial determination. Therefore, the only remaining issue is whether the Air Force improperly failed to conduct its own inquiry into EASI's compliance with the subcontracting limits.

No statute or regulation imposes such a duty upon the Air Force. 13 C.F.R. § 121.905(b) provides that

> in the absence of a written protest by other offerors or other credible information which would cause a contracting officer or SBA to question the veracity of the self-certification, a contracting officer may accept the self-certification at face value for the particular procurement involved.

This provision only governs the circumstances under which the procurement agency must file its own protest. *See* 13 C.F.R. § 121.905(c) (setting forth rules for protests by offerors, the contracting officer, or the SBA). It does not state that the procuring agency cannot rely upon an SBA determination once someone has already filed a protest and the SBA has considered it.

The statutory provision itself does not support Marwais's claim either. It only states that "[a] concern may not be awarded a contract ... as a small business ... unless the concern *agrees* that" the 50 percent limit will be met. 15 U.S.C. § 644(*o*)(1) (emphasis added). This clause does not require anything more of the procuring agency than an assurance that self-certification exists.

Marwais did not include this count in its cross-motion for summary judgment, and has maintained that material facts exist with respect to this issue. However, because the Air Force had no duty to look beyond the SBA's original determination, the claim fails and cannot survive the defendants' request for summary judgment.

## VII. Count Five

 Marwais also contests the Air Force's and DOL's findings of EASI's Walsh–Healey Act eligibility. The act requires that large government contracts be awarded only to manufacturers or regular dealers. 41 U.S.C. § 35(a). There are at least three sections of the Walsh–Healey regulations that shed light upon the definition of "manufacturer." [9]

One section of the regulations states that a bidder shall be deemed to be a "manufacturer" if the bidder

> owns, operates, or maintains a factory or establishment that produces on the premises the materials, supplies, articles, or equipment required under the contract and of the general character described by the specifications.

41 C.F.R. § 50–201.101(a)(1). A bidder can fit within this category by being an "established manufacturer" or a "newly entering" manufacturer. Another section of the Walsh–Healey regulations makes this point:

> A bidder who desires to qualify for an award as a manufacturer must show before the award that it is ... an established manufacturer of the particular good or goods of the general character sought by the Government (i.e., that a bidder has a plant, equipment and personnel to manufacture on its own premises the goods called for under the contract).

41 C.F.R. § 50–206.51(b).

There is also a section of the regulations describing "the standards that an assembler must meet to qualify as a manufacturer." 41 C.F.R. § 50–206.52. There is a critical ambiguity in this section, which is at the heart of the parties' dispute. It is not clear if all entities who are qualified as manufacturers under one of the first two cited sections must also qualify under the assembler provision. Marwais suggests that they must, and that EASI does not qualify under the assembler provision. The defendants suggest that EASI qualifies under the first two provisions alone, and need not prove compliance with the assembler provision.

---

**9.** The FAR also covers Walsh–Healey eligibility but does not add any relevant criteria beyond those in the Walsh–Healey regulations. *See* FAR § 22.606–1.

The defendant's interpretation is the better one. The language of the three provisions suggests that the assembler provision does not apply to all potential bidders. 41 C.F.R. § 50–206.52, ("Assembler"), states that it sets forth "standards that an *assembler* must meet to qualify as a manufacturer." The other two sections set forth the rules under which "bidder[s]" qualify as manufacturers. 41 C.F.R. § 50–201.101 ("Manufacturer or regular dealer"); 41 C.F.R. § 50–206.51 ("Manufacturer"). These words show that the manufacturer provisions contain universal criteria, whereas the assembler section contains rules for bidders who happen to be assemblers.

EASI does not claim to qualify under the assembler provision. According to the facts of its proposal, it is essentially a general contractor that will use EPIC's resources and contribute only a few minor elements of the kit.[10] Therefore, the question is whether EASI qualifies as a manufacturer. The manufacturer provisions allow a firm to show that it is in the business of producing goods of "the general character" as those sought in a procurement, but do not require the firm to produce those goods for the contract in question. 41 C.F.R. §§ 50–201.101(a)(1), 50–206.51(b).

The DOL opinion states

[W]e concur in [the Air Force's] determination that EASI qualifies for award under ... 41 CFR 50–201.101(a).

Therefore, the DOL found that EASI was qualified under the "manufacturer" clause of the regulations. The DOL opinion also stated that EASI met the requirements of the assembler provision, but this court need not evaluate that conclusion because the first ground of qualification can stand alone, for the reasons described above.

Marwais challenges even the determination that EASI was qualified under the manufacturer provision, stating that it lacked certain necessary equipment to produce the corrugated steel pieces for the walls in the kit. However, the administrative record shows

that the Department of Labor did not act arbitrarily or capriciously in finding that EASI was qualified under the manufacturing provision. Administrative Record at tabs 29, 30, 31.

## VIII. Motion for Preliminary Injunction

Because the court will grant summary judgment in favor of the defendant on all counts, Marwais's claim for a preliminary injunction is denied.

## IX. Conclusion

For the foregoing reasons, the defendants' request for summary judgment is granted and the plaintiff's request for summary judgment is denied. The plaintiff's request for preliminary injunction is also denied, and the case is dismissed.

---

**10.** EASI plans to manufacture the connecting pins and flaring tools and to purchase the poly- ethylene film and galvanized screen wire.